**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

T-MOBILE NORTHEAST LLC f/k/a Omnipoint
Communications, Inc.,

                                                            15-cv-2751(FB)(SMG)

                   Plaintiff,

        -against-

WARREN, LLC, BEACH LANE MANAGEMENT, INC.,
DEAN REALTY LLC, MARK SCHARFMAN,
MARZ REALTY, INC., OCEANS 2, LLC, and MITCHEL
ROTHKEN a/k/a MITCHELL ROTHKEN and a/k/a/
MITCH ROTHKEN,

                   Defendants.

-------------------------------------------------------------------------x

---

## MEMORANDUM OF LAW OF PLAINTIFF, T-MOBILE NORTHEAST LLC, IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

                                RAPAPORT LAW FIRM, PLLC
                                *Attorney for Plaintiff*
                                *T-Mobile Northeast LLC*
                                350 Fifth Avenue, Suite 4400
                                New York, New York 10118
                                Phone: (212) 382-1600
                                Email: mrapaport@rapaportlaw.com

*On the Brief:*

Marc A. Rapaport

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... ii

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

   Defendants Control Four Buildings at Which They are Denying T-Mobile's Access
      to its Rooftop Equipment in Violation of the Express Terms of the Leases ................. 2

   The Blanket Prohibition Jeopardizes Public Health and Safety .................................. 4

   Each Lease Provides T-Mobile With Around-the-Clock, Daily Access ..................... 5

   Defendants' Escalation from Obstruction to Complete Denial of Access .................. 6

      From June, 2013 through October, 2014, Access is Severely Restricted ........................ 6

      From November, 2014 to Present, Access is Completely Blocked ........................ 7

      Total Blockade From All Sites and Scharfman's Threat to Dismantle
         T-Mobile's Equipment: ................................................................................. 8

ARGUMENT ........................................................................................................................... 9

   POINT I:        T-MOBILE SHOULD BE GRANTED IMMEDIATE
                  INJUNCTIVE RELIEF ............................................................... 10

     A.   T-Mobile Will Suffer Irreparable Harm Absent An Injunction ............................... 11

     B.   There is a Significant Likelihood That T-Mobile Will Be Successful on
        the Merits of Its Claims .......................................................................... 14

     C.   The Balance of Hardships Weigh Heavily in T-Mobile's Favor ........................... 15

     D.   An Injunction Will Serve the Public Interest ......................................... 16

   POINT II:      THE COURT SHOULD NOT REQUIRE T-MOBILE
                  TO POST A BOND ................................................................... 17

CONCLUSION ....................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*41st RKC Tribune Assocs. v. Small Computer Co.*, 495 N.Y.S.2d 640, 641
        (Civ. Ct. New York County 1985)......................................................................... 15

*700 Broadway 1891 LLC v. Pro. for Pub. Spaces*, Index No. 603345/09
        (Supreme Court NY County, 12-1-2010) 2010 NY Slip Op. 3380(U)............................ 13

*American Tract Soc. v. Jones*, 134 N.Y.S. 611, 612 (1st Dep't 1912) ........................................ 15

*Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999)............................ 12

*Citigroup Global v. VCG Special Opport.*, 598 F.3d 30, 40 n.4 (2d Cir. 2010).......................... 11

*Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624 (2d Cir. 1976)...................................................... 17

*Coinmach Corp. v. Alley Pond Owners' Corp.*, 25 A.D.3d 642 (2d Dept. 2006) ....................... 12

*Cosgrove v. Board of Educ. of Niskayuna Cent. School Dist.*, 175 F. Supp. 2d 375, 399
        (N.D.N.Y. 2001) .............................................................................................................. 17

*Deeper Life Christian Fellowship, Inc. v. Board of Educ. of the City of New York*,
        852 F.2d 676, 679 (2d Cir. 1988)................................................................................. 10

*Doe v. Dinkins*, 192 A.D.2d 270, 275 (1993) .............................................................................. 11

*Grand Manor Health Related Facility, Inc. v. Hamilton Equities, Inc.,* 85 A.D.3d 695 (2011).. 12

*Greene & Zinner, P.C. v. Hansen*, 1998 N.Y. Misc. LEXIS 781 (2d Dep't) May 28, 1998 ........ 15

*Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)............................................................. 14

*Haskins v. George A. Fuller, Co.*, 72 N.Y.S. 440 (Sup. Ct. N.Y. Co. 1901)............................... 13

*Incantalupo v. Lawrence Union Free School District Number 15*, 652 F. Supp. 314, 322
        (E.D.N.Y. 2009)................................................................................................................ 10

*Jackson Diary Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) ......................... 10

*La Mirada Prods. Co., Inc. v. Wassal PLC*, 823 F. Supp. 138, 141 (S.D.N.Y. 1993) ................. 13

*Munaf v. Geren*, 553 U.S. 574, 129 S. Ct. 2207, 2218-19 (2008) ............................................... 10

*Nanuet Nat'l Bank v. Saramo Holding Co.*, 153 A.D.2d 927, 929 (2d Dep't 1989)................... 11

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993) ......... 13, 14

*New York SMSA Ltd. Partnership v. 225 5th LLC*, 8 Misc. 3d 1019(A)
        (Sup. Ct. N.Y. Cty. 2005) ................................................................................................ 15

*OSG, LLC v. 119 West 25th, LLC*, 867 N.Y.S.2d 18 (Sup. Ct. N.Y. Co. 2008)........................... 12

*Popyork, LLC v. 80 Court St. Corp.*, 23 A.D.3d 538 (2d Dep't 2005)........................................ 11

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)............................................. 11

*Rx USA Wholesale, Inc. v. Dept. of Health and Human Servs.*, 467 F. Supp. 2d 285, 289

    (E.D.N.Y. 2006)........................................................................................................ 14

*South Amherst, Ltd. v. H.B. Singer, LLC*, 13 A.D.3d 515, 517 (2d Dep't 2004)......................... 12

*Ticor Tiles Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ...................................................... 11, 13

*Tioronda, LLC v. State of New York*, 386 F. Supp. 342, 349 (S.D.N.Y. 2005) ........................... 12

*Tom Doherty Ass'n v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995) .............................. 11

*Waldbaum's, Inc. v. Fifth Avenue of Long Island Realty Assocs.*, 85 N.Y.2d 600 (1995) ........... 12

*Workbench, Inc. v. Syblin Realty Corp.*, 140 A.D.2d 693 (2d Dept. 1988)................................. 12


**Statutes**

Telecommunications Act of 1996, Pub. Law. 104-104, 110. Stat. 56 (1996) .............................. 16

Wireless Communications and Public Safety Act of 1999, Public Law 106-81,

    113 Stat. 1286-1290 .......................................................................................... 16


**Other Authorities**

11A Wright–Miller–Kane, FEDERAL PRACTICE AND PROCEDURE (2d ed.1995) at 293.. 18

*State by the President on the Wireless Communications and Public Safety Act of 1999*,

    1999 WL 974333 (Oct. 26, 1999) ................................................................. 17


**Regulations**

47 C.F.R. § 22.901................................................................................................................. 17

## PRELIMINARY STATEMENT

Plaintiff, T-Mobile Northeast LLC ("T-Mobile"), brings this order to show cause for a preliminary injunction because Defendants/landlords are unlawfully denying it access to its four leaseholds located on the roofs of four buildings that Defendants control. T-Mobile maintains rooftop cell sites on each of these buildings (located in Brooklyn and Queens), thereby providing crucial voice and data communication services to the public and to emergency responders. T-Mobile filed its complaint (the "Complaint") on May 12, 2015.

During the two months that have elapsed since the Complaint was filed, Defendants have offered no indication that they are willing to begin honoring their contractual obligations to provide access. To the contrary, on May 27, 2015, they again denied access to a T-Mobile contractor who sought to upgrade T-Mobile's antennas at one of the Brooklyn properties.

Defendants' blanket access denials regarding all four buildings have persisted since on or about November 19, 2014 (*i.e.*, for approximately seven months). On that date, Defendants' counsel wrote that Defendants would not consider any requests by T-Mobile's personnel to access T-Mobile's leaseholds, allegedly due to an Environmental Control Board ("ECB") violation pertaining to one of the buildings.

Unless T-Mobile is granted access to its equipment, its continued ability to provide voice and data communications services to the public and to emergency responders – including crucial E911 services – will be jeopardized. As discussed in the Complaint, T-Mobile has had difficulty gaining access to these four sites since 2013; yet it was not until 2014 that this blanket access prohibition commenced. It has persisted ever since.

Accordingly, T-Mobile seeks a preliminary injunction that enjoins defendants Warren, LLC ("Warren"), Beach Lane Management ("BLM"), Dean Realty LLC ("Dean Realty"), Mark

1

Scharfman ("Scharfman"), Marz Realty, Inc. ("Marz Realty"), Oceans 2, LLC ("Oceans 2"), and Mitchel Rothken a/k/a Mitchell Rothken a/k/a Mitch Rothken ("Rothken") (collectively, "Defendants") from interfering with T-Mobile's unfettered rights of access to its demised premises at the four buildings, and from interfering with T-Mobile's maintenance and upgrades of its communication equipment.

## STATEMENT OF FACTS

### Defendants Control Four Buildings at Which They are Denying T-Mobile's Access to its Rooftop Equipment in Violation of the Express Terms of the Leases

Defendants have been blocking T-Mobile personnel from accessing T-Mobile's communications equipment on the roofs of the following four buildings (the "Buildings"):

   a) 95-08 37th Avenue, Queens, New York 11372 ("95-08 37th Ave");

   b) 42 Hicks Street, Brooklyn, New York 11201 ("42 Hicks");

   c) 568 Pacific Street, Brooklyn, New York 11217 ("568 Pacific"); and

   d) 2510 Ocean Parkway, Brooklyn, New York 11235 ("2510 Ocean").

The Buildings are part of Defendants' real estate enterprise, consisting of approximately 100 multiple-family dwellings controlled by Scharfman (the CEO of the Building management company, BLM). Upon information and belief, Scharfman is the highest-ranking executive in each entity holding title to the Buildings.

T-Mobile has long-term leasehold interests for portions of the roof at each Building. Until 2013, Defendants provided T-Mobile with keys to access its cell sites to perform inspections, maintenance, and equipment repairs. The leases all mandate such unfettered access, 24-hours per day, 7-days per week, without charge. They also require Defendants to refrain from

interfering with T-Mobile's installation and maintenance of its communication equipment.[1]

T-Mobile has had difficulty gaining access to these four sites since 2013. In 2014, Defendants escalated the matter to a blanket prohibition on all access. The reason Defendants cite for this blanket prohibition is an ECB violation at one of the Buildings. Specifically, Defendants' attorney, Todd Rose, wrote on November 19, 2014, "[p]lease be advised that our client cannot consider such requests for access until the far more serious matter of the above-described [ECB] violation is addressed." (Declaration of Marc Rapaport, Ex. 3). Since that date, Defendants have refused to cooperate with T-Mobile in resolving the ECB violation. Instead, they choose to use it as a pretext for the blanket access prohibition.

Rothken, who exercises managerial responsibilities for Defendants, began limiting access in June, 2013 by instituting a new requirement that T-Mobile could not access its cell sites without first emailing him the access request. (Declaration of Robert Ciaglia ("Ciaglia Dec.") ¶¶ 9, 42). Thereafter, he required T-Mobile to gain permission from Defendants' engineer – and to pay this engineer unspecified advance sums – before gaining access its cell sites. (Ciaglia Dec. ¶¶ 14, 72-76). Even though these requirements are utterly beyond what is required by the leases, T-Mobile's personnel tried to acquiesce. Nonetheless, those efforts were futile. T-Mobile's emails and phone calls to Rothken and Defendants' engineer went unanswered. In the few instances when Rothken bothered to respond, his responses consisted of sarcastic denials of access and further instructions to contact Defendants' engineer. Access denials occurred even when requests were made solely to visually inspect equipment (Ciaglia Dec. ¶¶ 14, 74). At this point, the need to perform basic maintenance, as well as equipment modernization, has become urgent. (Ciaglia Dec. ¶¶ 4, 5, 82, 83).

---

[1] Copies of the four Leases and amendments thereto are annexed to the Complaint [Docket No. 1] as Exhibits A through I. The Complaint is annexed to the accompanying Declaration of Marc A. Rapaport, Esq. ("Rapaport Decl."), as **Exhibit 1** thereto.

On December 31, 2014, Scharfman threatened to remove T-Mobile's communication equipment. T-Mobile's ability properly to serve its customers and emergency responders is now in jeopardy. (Ciaglia Dec. ¶¶ 7, 15, 56, 68).

### *The Blanket Prohibition Jeopardizes Public Health and Safety*

The cell sites at issue provide wireless voice and data communication service to residents and businesses. As required by the Federal Communications Commission ("FCC"), the sites (i) service municipal emergency personnel; (ii) allow the public to access Enhanced 911 ("E911") emergency support; and (iii) permit emergency responders to communicate in performing life-saving activities. Moreover, T-Mobile participates in the Wireless Emergency Alerts Public Safety System ("WEA"), which enables T-Mobile users to receive geographically-targeted emergency cell phone alerts regarding imminent safety threats (such as terrorist threats, chemical spills, Amber Alerts, and severe weather alerts) (Ciaglia Dec., ¶ 12).

All four sites experience significant E911 usage. Following is a chart showing the number of E911 calls made over a recent 45-day period (12/29/14-2/11/15) at each cell site:

| Site: | Number of Calls: |
|---|---|
| 42 Hicks (Brooklyn) | 22 |
| 95-08 37th Avenue (Queens) | 200 |
| 2510 Ocean Parkway (Brooklyn) | 162 |
| 568 Pacific Street (Brooklyn) | 346 |

(Ciaglia Dec., ¶ 12).

T-Mobile's property management personnel have had numerous telephone and email communications with Rothken in an attempt to resolve this impasse. Nonetheless, Rothken has belligerently refused to cooperate. Urgent redress is required because T-Mobile must ensure its equipment is well maintained, properly functioning, upgraded as needed, and in compliance with applicable laws.

***Each Lease Provides T-Mobile With Around-the-Clock, Daily Access***

T-Mobile invests enormous financial resources when selecting cell sites (based on location, elevation, and coverage needs). Each rooftop site is uniquely situated based on communication needs and the unique characteristics of the selected building. If a site is impaired or malfunctioning, T-Mobile's customers who reside, work and/or travel through that area may experience lost calls and an inability to send or receive data communications. Due to the enormity of the investment and the vital role that cell service provides, leases of this nature typically: (a) convey long-term interests; (b) contain assurances that landlords will provide unimpeded 24-hour access, and that maintenance, repair and upgrades will not be obstructed; and (c) require landlords to cooperate in obtaining necessary permits and licenses.

- The 37th Avenue Lease grants T-Mobile "24-hours-a-day, 7-days-a-week access to the Premises at all times during the Initial Term of this Lease and any Renewal Term, at no charge to Tenant." Complaint, Ex. A. at ¶ 7(f).

- The 42 Hicks Lease grants T-Mobile "twenty-four (24) hours, seven (7) days a week access to the Premises without charge to Lessee, Lessee's employees or any subcontractors or agents . . . which shall remain unimpeded through the initial term and any renewal term of this Agreement." Complaint Ex. B at ¶ 2(d).

- The 568 Pacific Lease grants Lessor "twenty-four (24) hours, seven (7) days a week access to the Premises without charge to Lessee, Lessee's employees or any subcontractors or agents. Lessor acknowledges that the Lessee has such access which shall remain unimpeded throughout the initial term and any renewal term of this Agreement." Complaint Ex. E at ¶ 2(d).

- The 2510 Ocean Parkway Lease provides that "Tenant shall have 24-hours-a-day, 7-days-a-week access to the Premises ("Access") at all times during the initial Term of this Lease and any Renewal Term. In the event that Landlord, is employees or agents without written notice to Tenant, impede or deny Access to Tenant, its employees or agents, Tenant shall, without waiving any other rights that it may have at law or in equity, abate from future Rent an amount equal to the current Rent per day for each day that Access is denied or impeded." Complaint Ex. I at ¶ 7(f).

5

***Defendants' Escalation from Obstruction to Complete Denial of Access***

From June, 2013 through October, 2014, Access is Severely Restricted

In June, 2013, T-Mobile first ascertained that the locks to the Buildings had been changed. (Ciaglia Dec. ¶¶ 42-43, **Ex. 1** (Letter of Carolyn Gold ("Gold")). Thereafter, on September 12, 2013, T-Mobile technician Alan Duval and T-Mobile Property Specialist Gold informed Rothken that T-Mobile needed access to its leasehold 37 Avenue because "[T-Mobile's] 911 system located at 95-08 37th Avenue is not working," and that emergency repairs were needed. (Ciaglia Dec. ¶ 45, **Ex. 2** (Duval email to Rothken dated 9.12.13 and Gold email to Rothken dated 9.13.13)). The next morning, Rothken responded that Defendants would permit access solely for diagnostic tests, and that "[N]o work can occur without [Defendants'] further approval." (Ciaglia Dec. ¶ 45, **Ex. 3** (Rothken email to Gold dated 9.13.13)). Later that day, Rothken wrote to Gold,

> Let me know if and when you wish to avail yourself of access limited to a diagnostic inspection. We will address further requests based on your findings if received insufficient detail to permit an informed decision.

(Ciaglia Dec. ¶ 46, **Ex. 4** (Rothken email to Gold dated 9.13.13 sent at 8:29 a.m.)). T-Mobile again sought this access in August 2014. On Friday, August 22, 2014, Alan Duval ("Duval"), a T-Mobile technician, emailed Rothken, requesting access the following Monday. Rothken responded, "Monday will not work as this is grossly inadequate advance notice." On that Monday morning, Rothken denied access until after Labor Day:

> You are all out of your mind if you than that what Duval did was reasonable. It was the end of a Friday in August and he wants access today. Seriously? Weekend days count for nothing. I am out today and tomorrow and we are on skeleton staff until after Labor Day. I bet you are too.

(Ciaglia Dec. ¶¶ 47-49, **Ex. 5-7** (copies of the foregoing email communications)).

6

<u>From November, 2014 to Present, Access is Completely Blocked</u>

In or about November, 2014, T-Mobile requested access to 2510 Ocean for the limited purpose of ascertaining if its equipment complied with firefighter safety regulations.  Also, on November 3, 2014, T-Mobile Property Specialist Samantha Griggs ("Griggs") wrote to Rothken stating,

> Good morning Mr. Rothken.  I am writing to request access to 2510 Ocean Parkway, Brooklyn, NY for Wednesday November 5, at 9:00 a.m. C. Schiffmacher from Batter Corp. will be testing our batteries. No other work will be performed.  It will take him about an hour.

(Declaration of Samantha Griggs ("Griggs Dec.") dated July 6, 2015, ¶ 2, Ciaglia Dec. Ex.19).

Defendants ignored her request, and access was not granted.  (Griggs Dec. ¶ 3).

On November 24, 2014, Terry Baker ("Baker"), the Lead Project Manager for T-Mobile's contractor, Skynet, wrote to Rothken requesting access to 42 Hicks:

> Mitch, hope this email finds you well.  Please be advised that I have a field engineer scheduled to visit [42 Hicks] either tomorrow or Wednesday.  The purpose of this visit is to strictly perform a site assessment to ensure that we are complying with FDNY regulations.  Please let me know which day is better for the building to provide access. Thanks!

(Declaration of Terry Baker, dated July 1, 2015 ("Baker Dec.") ¶ 4, Ciaglia Dec. Ex. 12).

Rothken's email response denied based and insisted that all access requests be vetted by Defendants' engineer.  By email dated November 24, 2014 at 12:02 p.m., Rothken wrote:

> You need to present a complete scope of what you need to do to Jim Moore, our engineer first.  The [sic] is is [sic] at your cost.  If he approves, www [cic] can then discuss access.

(Baker Dec. ¶ 5, Ciaglia Dec. Ex. 13).  Later that same day, Rothken wrote:

> Need to present this to Jim Moore.  Nobody goes on our riff [sic] without clearance from him.  A roof costs a fortune and all the carriers, yours included, have a consistent pattern of damage to roofs.

(Baker Dec. ¶ 6, Ciaglia Dec. Ex. 14).

The following month, in response yet a further follow-up access request, Rothken again demanded that T-Mobile pay Defendants' engineer as a pre-requisite.  On December 4, 2014, Rothken emailed Baker as follows:

> All I know is someone needs to put boots on the ground and as long as the ground is our roof nobody has access until Jim Moore reviews it and assures us it is okay.

(Baker Dec. ¶ 8, Ciaglia Dec. Ex. 16).

On January 21, 2015, Ms. Baker followed up again:

> I never received a response to my access request below.  Please advise if we will be granted access for our FDNY site audit, or what else it is you need from me in order to approve access.  Thank you.

(Baker Dec. ¶ 9 and Ex. 1).

The next day, Rothken again demanded an advance payment of an unspecified sum to Defendants' engineer.  (Baker Dec. ¶ 10, Ciaglia Dec. Ex. 18).

<u>Total Blockade From All Sites and Scharfman's Threat to Dismantle T-Mobile's Equipment:</u>

Ultimately, Defendant's counsel, Todd Rose, advised that there would be zero access going forward.  By letter dated November 19, 2014, he stated that the ECB violation at another building was the basis for this decision:

> [W]e are informed that your client has requested access to the roof of 95-08 37th Avenue, Queens, New York for the purpose of taking pictures.  Please be advised that our client cannot consider such requests for access until the far more serious matter of the above-described [ECB] violation is addressed.

(Ciaglia Dec. ¶ 55, Ex. 9)

On December 31, 2014, T-Mobile's contractor, Fred Sadykov ("Sadykov") of Gotham Communications ("Gotham"), called Defendants to request access at 37th Avenue and 568 Pacific.  Scharfman responded that T-Mobile would not have access to any of Buildings, and he threatened to remove T-Mobile's equipment. (Ciaglia Dec. ¶¶ 56, 68, Ex. 11).

On December 31, 2014, counsel for T-Mobile wrote to Rose, stating in part:

> [t]here is no justification for your clients' unlawful threat.  T-Mobile NE hereby demands that the Landlords and all persons acting under their direction and control cease and desist from interfering with T-Mobile NE's equipment at the buildings.  T-Mobile NE further demands that access to the leaseholds at the buildings be immediately restored, and that the Landlords execute the variance application forms that are vital to T-Mobile NE's ability to utilize its leaseholds in the manner provided for under the respective leases.

(Rapaport Dec. Ex. 4).

On May 27, 2015 Rothken wrote (in response to an access request of that date for an equipment upgrade) "[g]iven the lawsuit and given that we are represented by counsel, please cease all further direct communications with us and have your attorney direct all future correspondence to our attorney. . . ." (Baker Dec. ¶¶ 11-12, Ciaglia Dec. Exs. 20-21). On July 13, 2014, T-Mobile received a similar reply in response to a request to perform a routine equipment cleaning. (Rapaport Dec. Ex. 5).

In sum, T-Mobile has been denied access at all four Buildings for approximately seven months.  What began as a costly inconvenience in 2013 has become a threat to T-Mobile's ability to serve the needs of its customers and emergency responders.  The communication equipment requires maintenance, repair and updating.  This is impossible without access.  Furthermore, without site access, Fire Code variance efforts cannot proceed.  Defendants rely on code noncompliance as their basis for the blanket access denial, yet they refuse to cooperate in obtaining compliance.  For the following reasons, a preliminary injunction must be granted.

## **ARGUMENT**

T-Mobile hereby seeks injunctive relief as follows:

A)    enjoining Defendants, their agents, servants, officers, members, representatives and employees, and all other persons acting in concert with them (hereinafter "Defendants et al.") as follows:

(i) ordering Defendants et al. to provide T-Mobile unfettered 24-hour, 7-day per week access to each of its four leaseholds, without any need for Defendants' permission;

(ii) ordering Defendants et al. to provide T-Mobile with operational keys for all four of its leaseholds;

(iii) ordering Defendants et al. to allow T-Mobile to upgrade, repair, and/or replace its equipment at these leaseholds at any time; and

(iv) ordering Defendants et al. to cease all preconditions and monetary threats regarding T-Mobile's four leaseholds at issue herein.

B)   enjoining Rothken, his agents, employees, and all other persons acting in concert with him (hereinafter "Rothken et al.") to refrain from denying access to T-Mobile's four leaseholds as follows:

(i) ordering Rothken et al. to cease all preconditions and monetary threats regarding T-Mobile's four leaseholds; and

(ii) ordering Rothken et al. to cease interfering with these four leaseholds in any way.

## POINT I:      T-MOBILE SHOULD BE GRANTED IMMEDIATE INJUNCTIVE RELIEF

To obtain a preliminary injunction, an applicant must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Deeper Life Christian Fellowship, Inc. v. Board of Educ. of the City of New York*, 852 F.2d 676, 679 (2d Cir. 1988) (quoting *Jackson Diary Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (*per curium*)).  Courts also look at whether an injunction is in the public's interest.  *See Munaf v. Geren*, 553 U.S. 574, 129 S. Ct. 2207, 2218-19 (2008); *Incantalupo v. Lawrence Union Free School District Number 15*, 652 F. Supp. 314, 322 (E.D.N.Y. 2009).  Applications for mandatory preliminary inunctions, though subject to a more rigorous standard than prohibitory injunctions, are appropriately

granted where a movant makes a "clear showing" that it is "entitled to the relief requested." *Citigroup Global v. VCG Special Opport.*, 598 F.3d 30, 40 n.4 (2d Cir. 2010). Where, as here, "[h]uman safety is in issue. . . [t]he proof required for a finding of the likelihood of success on the merits is reduced." *Doe v. Dinkins*, 192 A.D.2d 270, 275 (1993) (citations omitted) (affirming grant of preliminary injunction requiring cure of existing fire code violations).

T-Mobile herein makes a clear showing for both mandatory and prohibitory and injunctive relief. Defendants' willful refusals to abide by the Lease terms threaten to cause irreparable harm to T-Mobile and those who rely on its network. The leases are indisputably valid, and Defendants have offered no valid reason for their failure to comply with the unambiguous provisions thereof.

### A.   T-Mobile Will Suffer Irreparable Harm Absent An Injunction

Courts have held that the loss of good will, reputation, and relationships with customers constitute irreparable harm that may warrant injunctive relief. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). In that case, the Second Circuit noted that it would be impossible to estimate with precision the monetary losses resulting from "the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" *Id.* (quoting *Ticor Tiles Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)); *see also Tom Doherty Ass'n v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995) ("a loss of prospective goodwill can constitute irreparable harm."); *Popyork, LLC v. 80 Court St. Corp.*, 23 A.D.3d 538 (2d Dep't 2005) (finding that if tenant's lease was not renewed, it would lose goodwill); *Nanuet Nat'l Bank v. Saramo Holding Co.*, 153 A.D.2d 927, 929 (2d Dep't 1989) (because tenant had developed a large clientele in the neighborhood, tenant would suffer a substantial loss if renewal was not permitted).

In *Waldbaum's, Inc. v. Fifth Avenue of Long Island Realty Assocs.*, 85 N.Y.2d 600 (1995), the court found that forfeiture of the tenant's "valuable improvements" and the goodwill built up by the plaintiff at the store location warranted a preliminary injunction; *see also Coinmach Corp. v. Alley Pond Owners' Corp.*, 25 A.D.3d 642 (2d Dept. 2006) (after plaintiff made a number of substantial renovations to the leased premises, access was denied and a preliminary injunction issued); *Grand Manor Health Related Facility, Inc. v. Hamilton Equities, Inc.,* 85 A.D.3d 695 (1st Dept. 2011) (granting preliminary injunction where plaintiff-tenant was at risk of losing a valuable leasehold).

New York's federal courts have also held that depriving a party of an interest in real property constitutes irreparable harm, and that such irreparable harm is, inherently, not capable of being remedied with a monetary award. *See Tioronda, LLC v. State of New York*, 386 F. Supp. 342, 349 (S.D.N.Y. 2005) (citing *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999) (other citation omitted). New York state courts have also ruled that in landlord-tenant disputes, irreparable injury is clear where the tenant shows the subject premises is "uniquely suited to its needs in terms of size and location." *Workbench, Inc. v. Syblin Realty Corp.*, 140 A.D.2d 693 (2d Dept. 1988); *see also South Amherst, Ltd. v. H.B. Singer, LLC*, 13 A.D.3d 515, 517 (2d Dep't 2004) (landlord was enjoined from selling a leasehold during the pendency of an action, as "the property at issue [was] uniquely suited to plaintiff's . . . business, giving rise to a danger of irreparable injury if the injunction is not granted.").

New York courts have not hesitated to find that the irreparable injury prong is satisfied where a landlord threatens alterations that would impinge upon a leasehold. *OSG, LLC v. 119 West 25th, LLC*, 867 N.Y.S.2d 18 (Sup. Ct. N.Y. Co. 2008); *Haskins v. George A. Fuller, Co.*, 72

12

N.Y.S. 440 (Sup. Ct. N.Y. Co. 1901).  Irreparable injury to a tenant has been found where the landlord's actions threaten the tenant's "ability to do business at the demised premises."

Under New York law, an order directing specific performance of a contract is warranted where it is established that there exists a valid contract; that the applicant has substantially performed; that both parties are able to continue performing their obligations; and that the applicant has no adequate remedy at law.  *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993) (setting forth standards applicable to requests for specific performance and preliminary injunctions); *Ticor Tile Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999) (business' loss of reputation or goodwill cannot be compensated through money damages; *La Mirada Prods. Co., Inc. v. Wassal PLC*, 823 F. Supp. 138, 141 (S.D.N.Y. 1993) (directing specific performance of contract where assessment of money damages could not be measured with reasonable degree of certainty).   Indeed, courts have granted mandatory preliminary injunctions to tenants in far less compelling circumstances.  *See, e.g., 700 Broadway 1891 LLC v. Pro. for Pub. Spaces*, Index No. 603345/09 (Supreme Court NY County, 12-1-2010) 2010 NY Slip Op. 3380(U) (directing landlord to place signage in lobby for tenant pending resolution of the case).

Here, there can be no argument that the four leases at issue are valid and in effect. Likewise, there is no question that T-Mobile has performed its contractual obligations, and that all parties are able to perform their respective obligations.  If T-Mobile is not able to provide wireless communications service, its customers can easily switch carriers, and potential customers can select other carriers.  The occurrence of dropped calls, slowdowns in service and/or a lack of data service will result in T-Mobile losing the goodwill that it has endeavored to develop over the last fifteen years in the community, and the likely outcome will be the loss of

existing and prospective customers.  *See* Ciaglia Dec. ¶¶ 17, 82.  The interest of the public is also implicated by Defendants' breaches.  If T-Mobile is not permitted access to its cell sites, the lack of communications services may impair E911 communications.  Defendants are therefore denying T-Mobile of bargained-for contractual rights for which there is no adequate remedy other than the equitable relief requested herein.

      **B.**     **There is a Significant Likelihood That T-Mobile Will Be Successful on the Merits of Its Claims**

Although a *likelihood* of success on the merits is required for a preliminary injunction, the moving party need not show a *certainty* of success.  *See Rx USA Wholesale, Inc. v. Dept. of Health and Human Servs.*, 467 F. Supp. 2d 285, 289 (E.D.N.Y. 2006).  Rather, the movant need only make a showing that the probability of prevailing is better than fifty percent.  *See Id.*

The evidence submitted with this motion overwhelmingly establishes that Defendants have materially breached the parties' agreements, and that T-Mobile is entitled to the remedy of specific performance.   Under New York law, a cause of action for breach of contract is established where the plaintiff proves "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by defendant, and (4) damages."  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  Specific performance is warranted as a remedy for breach of contract herein because valid contracts exist; T-Mobile has substantially performed on these contracts; all parties are able to continue performing their obligations; and T-Mobile has no adequate remedy at law.  *See Nemer Jeep-Eagle, Inc.*, 992 F.2d at 433.

Here, the supporting Declarations show that T-Mobile has complied with its contractual obligations, while Defendants are interfering with T-Mobile's rights without any legitimate cause.  As a direct consequence of Defendants' breaches, T-Mobile is in immediate jeopardy of

losing goodwill, current customers, and prospective customers.  Its customers are also at risk of losing emergency warnings and responses.  None of the foregoing can adequately be rectified though a money judgment.

Moreover, the law is clear that when a landlord deprives a tenant of access (e.g. by refusing to provide a key), an actual partial eviction exists.  *See, e.g., 41st RKC Tribune Assocs. v. Small Computer Co.*, 495 N.Y.S.2d 640, 641 (Civ. Ct. New York County 1985) ("Denial of access by refusal of a key is a classic form of actual partial eviction") (citation omitted); *Greene & Zinner, P.C. v. Hansen*, 1998 N.Y. Misc. LEXIS 781 (2d Dep't) May 28, 1998 (landlord's denial of access to tenant during non-business hours constitutes actual partial eviction); *American Tract Soc. v. Jones*, 134 N.Y.S. 611, 612 (1st Dep't 1912) ("It is well settled that, where there is a partial eviction by an arbitrary and willful interference with the tenant's right of ingress and egress, it is not essential, in order to set up the defense of partial eviction, that the tenant should have entirely vacated the premises.  It is sufficient if the evidence shows an interference with, or disturbance of, the beneficial enjoyment of the demined premises, intentionally committed by the landlord and injurious in its character.") (citations omitted).  As defendants have blocked T-Mobile's access to its cell sites, T-Mobile's partial actual conviction claim is likely to succeed on the merits, and the instant injunction should ensue.

### C.    The Balance of Hardships Weigh Heavily in T-Mobile's Favor

The hardships weigh heavily in T-Mobile's favor.  T-Mobile seeks nothing more than the rights to which it is unambiguously entitled under the Leases.  Defendants face no prejudice whatsoever insofar as an order would merely require them to honor their contractual obligations.  In *New York SMSA Ltd. Partnership v. 225 5th LLC*, 8 Misc. 3d 1019(A), 2005 WL 1774137 (Sup. Ct. 2005), where the landlord threatened to interfere with Verizon's equipment in violation of the lease, the court found that the balance of equities favored injunctive relief in

Verizon's favor because the landlord's interference jeopardized Verizon's relationships with customers and its ability to provide emergency wireless service.

### D.    An Injunction Will Serve the Public Interest

If Defendants are not ordered to honor their obligations under the Leases, the public will be harmed in at least three respects:  (1) T-Mobile's customers, and the public at large, will suffer the loss of voice and data communications; (2) emergency services personnel, including but not limited to 911 service, police, and local fire departments will, similarly, experience impairments in their voice and data communications; and (3) T-Mobile's customers may lose access to emergency safety notifications.

The loss of communications abilities affects both T-Mobile subscribers, as well as anyone attempting to communicate with a T-Mobile subscriber.  *See* Ciaglia Dec. ¶ 82. Consequently, impairments in T-Mobile's wireless network have far-reaching consequences, affecting thousands of individuals.

Congress recognized the public interest of having reliable wireless communications when it passed the Telecommunications Act of 1996.  On February 8, 1996, the President of the United States signed into law the Telecommunications Act of 1996, Pub. Law. 104-104, 110. Stat. 56 (1996).  Furthermore, Congress, recognizing that greater telecommunications capabilities will further public health, safety and welfare, enacted the "Wireless Communications and Public Safety Act of 1999," which is intended to "encourage and facilitate the prompt deployment throughout the United States of a seamless, ubiquitous and reliable end-to-end infrastructure for communications, including wireless communications, to meet the Nation's public safety and other communications needs."  Wireless Communications and Public Safety Act of 1999, Public Law 106-81, 113 Stat. 1286-1290.  In addition, FCC regulations provide that "[c]ellular licenses must allot sufficient system resources such that the quality of AMPS [compatible analog

services] provided, in terms of geographic coverage and traffic capacity, is fully adequate to satisfy the concurrent need for AMPS availability." 47 C.F.R. § 22.901.

The President of the United States issued a Statement on October 26, 1999 in support of signing the Wireless Communication and Public Safety Act of 1999, stating in relevant part:

> By making it easier to use wireless phones to report emergencies, this bill could save thousands of lives every year.
>
> Nearly 100,000 times each day, someone uses a wireless phone to make an emergency call. People with wireless phones can speed the delivery of public safety services by providing rapid reports of car crashes, incidents of aggressive or drunk driving, serious crimes, and natural disasters. Getting rapid care to someone who is suffering from a heart attack or is involved [in] a car crash can mean the difference between life and death.

*State by the President on the Wireless Communications and Public Safety Act of 1999*, 1999 WL 974333 (Oct. 26, 1999). At bottom, wireless communications serve as an essential conduit for individuals, businesses, emergency responders, and government agencies. Defendants' breaches directly affect T-Mobile, its customers, and the general public.

**POINT II:    THE COURT SHOULD NOT REQUIRE T-MOBILE TO POST A BOND**

Under Federal Rule of Civil Procedure 65, "the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court." *See Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624 (2d Cir. 1976) (citation omitted). Thus, "the district court may dispense with the filing of a bond." *Id.* (citations omitted). Indeed, Rule 65(c) states that the purpose of the discretionary bond is "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

In the instant matter, the requested relief involves the grant of access to T-Mobile's leaseholds. There is no risk of costs or damages to Defendants for this request. Accordingly, the bond would serve no purpose, and the court should dispense with it. *See, e.g., Cosgrove v. Board of Educ. of Niskayuna Cent. School Dist.*, 175 F. Supp. 2d 375, 399 (N.D.N.Y. 2001) ("A

district court may dispense with the posting of security entirely where the parties sought to be enjoined or restrained 'have not shown that they will likely suffer harm absent the posting of a bond.'" (citing in part 11A Wright–Miller–Kane, FEDERAL PRACTICE AND PROCEDURE (2d ed.1995) at 293, "the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant").

## CONCLUSION

For all of the foregoing reasons, it is respectfully requested that the Court grant T-Mobile's motion for a preliminary injunction.


Dated: New York, New York
       July 13, 2015

                                        RAPAPORT LAW FIRM, PLLC

                        By:    _____/s/_____
                                        Marc A. Rapaport
                                        350 Fifth Avenue, Suite 4400
                                        New York, New York 10118
                                        Phone: (212) 382-1600

                                        *Attorney for Plaintiff*
                                        *T-Mobile Northeast LLC*